**Jane Williams OLIVER, Plaintiff,**

v.

**Charleyrene Danforth HINES, et al., Defendants.**

**Case No. 1:12CV1032.**

United States District Court, E.D. Virginia, Alexandria Division.

May 21, 2013.

---

Jesse R. Binnall, Jonathan R. Bronley, Bronley & Binnall PLLC, Fairfax, VA, for Plaintiff.

George Olai Peterson, Tania Michelle Lafont Saylor, Peterson Saylor PLC, Fairfax, VA, Michael Thomas Marr, Sands Anderson PC, McLean, VA, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

T.S. ELLIS, III, District Judge.

In this removed diversity action, plaintiff seeks a declaratory judgment that the July 23, 2008 amended *inter vivos* trust (hereinafter the "2008 Amended Trust"[1]) of her father, Colonel William P. Oliver, is invalid. The parties conducted full discovery. In the course of discovery, a concern arose that subject matter jurisdiction might be lacking by virtue of the judicially-created probate exception to federal diversity jurisdiction. This concern was fully briefed, argued, and, in the end, resolved by Order dated March 5, 2013 and a Memorandum Opinion dated May 1, 2013, which concluded that the probate exception did not apply to this case. *See Oliver v. Hines,* 943 F.Supp.2d 634, 1:12–cv–1032, 2013 WL 1867367 (E.D.Va. May 1, 2013) (Memorandum Opinion),

Thereafter, the matter proceeded to a two-day bench trial[2] in which plaintiff presented four witnesses, defendants presented two witnesses, and a substantial number of exhibits were admitted. Plaintiff's four witnesses were plaintiff Jane Williams Oliver, computer forensics expert Michael Maschke, document expert Katherine Koppenhaver, and Janice Poindexter, the notary who notarized the 2008 Amended Trust. Defendants presented two witnesses: defendant Charleyrene D. Hines and defendant Patricia D. Lethgo. At the trial's conclusion, the matter was taken under advisement, and the parties submitted proposed findings of fact and conclusions of law. The following are the Court's findings of fact and conclusions of law in accordance with Rule 52, Fed.R.Civ.P.

### Findings of Fact

#### The Parties

- Plaintiff Jane Williams Oliver, a resident of New Jersey, is the sole surviving child of Colonel William P. Oliver, a decorated Marine Corps officer whose 2008 Amended Trust is at issue here.
- Defendant Charleyrene Danforth Hines, a resident of New Mexico, is a widow who lived in the same retirement community as Colonel Oliver and there developed a long-term, romantic relationship with him. The 2008 Amended Trust names Mrs. Hines the trustee of Colonel Oliver's trust upon his death and also names Mrs. Hines as the primary beneficiary

---

1. Plaintiff's Exhibits 5, 6. and 8 are duplicate originals of the 2008 Amended Trust with identical provisions. References hereafter to the 2008 Amended Trust refer to Exhibits 5, 6, and 8, the three duplicate originals. Exhibit 7 also appears to he an original of the 2008 Amended Trust but is missing pages 5 and 6 and is therefore not included in this reference.

2. Although the parties initially disputed whether a jury was required in this case, they agreed, in the end, to waive any jury trial right that might exist.

of the trust during her lifetime. She is sued both in her capacity as a trustee and in her individual capacity.

- Defendant Patricia D'Rene Danforth Lethgo is Mrs. Hines's daughter and a resident of New Mexico. Mrs. Lethgo regularly visited her mother and Colonel Oliver at the retirement community where Mrs. Hines and Colonel Oliver lived. Mrs. Lethgo is the primary residual beneficiary of the 2008 Amended Trust.

- Defendants Mary Kate Williams Johnson and Frederick Williams are Colonel Oliver's cousins. Defendant Daniel F. Johnson is married to Mary Kate Williams Johnson. All three are residents of Florida, and all three were named as beneficiaries of the 2008 Amended Trust. Although named as defendants, Mr. and Mrs. Johnson and Mr. Williams have not noticed an appearance.

### Jurisdiction and Venue

- On August 6, 2012, plaintiff filed this action in the Circuit Court of Fairfax County, Virginia, and on September 14, 2012, Mrs. Hines and Mrs. Lethgo, with the concurrence of Mr. and Mrs. Johnson and Mr. Williams, removed the case on the basis of diversity jurisdiction. The parties agree that venue is appropriate in this district. *See* 28 U.S.C. § 1391.

- Jurisdiction is proper as none of the defendants are resident in the same state as plaintiff, the amount in controversy exceeds $75,000, and the probate exception to diversity jurisdiction does not apply. *See* 28 U.S.C. § 1441; *Oliver v. Hines,* 943 F.Supp.2d 634, 1:12–cv–1032, 2013 WL 1867367 (E.D.Va. May 1, 2013) (Memorandum Opinion).

### The History of the 2008 Amended Trust

- Colonel William P. Oliver, a decorated retired Marine Corps officer and an attorney, died on January 22, 2012 at age 91. Although Colonel Oliver had been married previously, he was not married at the time of his death and was then living alone at the Fairfax, a retirement community for retired military officers in Fort Belvoir, Virginia. Colonel Oliver had lived at the Fairfax since 2000. Colonel Oliver had three children: a son who died in infancy, and two daughters, plaintiff and Nancy Harmon Oliver Gruen. Ms. Gruen predeceased Colonel Oliver in 2004. Plaintiff is Colonel Oliver's sole surviving child.

- While living at the Fairfax, Colonel Oliver met and developed a romantic relationship with Mrs. Hines. Mrs. Hines had moved to the Fairfax circa 1996 with her second husband, Colonel Hines, who died on November 1, 2002. Colonel Oliver and Mrs. Hines clearly cared deeply for each other and enjoyed a close relationship. They called each other every morning and every evening to check on each other, they ate lunch together every day at the Fairfax, they typically accompanied each other to doctors' appointments, and they went on many ocean cruises together, including some lasting as long as 60 days. During his lifetime, Colonel Oliver also made Mrs. Hines a joint account holder on his USAA Brokerage Account, his Wachovia bank account, and his Navy Federal accounts. (Def. Ex. 19).

- Mrs. Hines has two adult children, Howard Danforth and Mrs. Lethgo. At all times relevant here, Mrs. Lethgo lived in New Mexico and visited her mother at the Fairfax three or four time per year, typically for seven

to ten days at a time. It was during these visits that Mrs. Lethgo met and befriended Colonel Oliver. Mrs. Lethgo first met Colonel Oliver during a visit in 2003, and thereafter she saw him frequently during her visits until his death in 2012. Colonel Oliver had a close relationship with Mrs. Lethgo, and he depended on her for help with his estate.

- Colonel Oliver first created an *inter vivos* trust on April 22, 1992. (PL Ex. I). He amended the trust four times, and the amendments are dated February 6, 1998, September 4, 2002, March 14, 2005, and July 23, 2008. (Pl. Ex. I, H, G, and F). It is the July 23, 2008 amendment—the 2008 Amended Trust—that is contested here. The 2005 amendment named Mrs. Hines as the trustee following Colonel Oliver's death. The 2005 amendment provided that Mrs. Hines would be a lifetime beneficiary of the trust and that the principal of the trust would be used to pay her basic living expenses. All income from the trust assets during Mrs. Hines's lifetime were to be distributed as follows: five percent to John Cotton, thirty percent to plaintiff, five percent to Mrs. Johnson, and the remainder to Mrs. Hines. Upon Mrs. Hines's death, three and one-third percent of the assets remaining in the trust were to be distributed to John G. Cotton, ten and one-third percent to Mrs. Lethgo, three and one-third percent to Mr. Williams and Mrs. Johnson, and the remainder to plaintiff.

- In the 2008 Amended Trust, Mrs. Hines continues to be the trustee following Colonel Oliver's death and she also continues to be a lifetime beneficiary of the Trust. The 2008 Amended Trust differs from the 2005 version in that Mrs. Lethgo, rather than

plaintiff, is the primary beneficiary upon Mrs. Hines's death. The 2008 Amended Trust provided that Mrs. Hines would be a lifetime beneficiary of the trust and that the principal of the trust would be used to pay her basic living expenses. All income from the trust assets during Mrs. Hines's lifetime were to be distributed as follows: two and a half percent to plaintiff, five percent to Mr. and Mrs. Johnson, and the remainder to Mrs. Hines. Upon Mrs. Hines's death, two and one-third percent of the assets remaining in the trust were to be distributed to Mr. Williams, two and one-third percent to plaintiff, ten and one-third percent to Mr. and Mrs. Johnson, and the remainder to Mrs. Lethgo.

- The originals of the 2008 Amended Trust are signed by Colonel Oliver on the final page. Colonel Oliver did not sign or initial any of the other pages, nor is there any blank or space on the other pages indicating that a signature or initials should be placed there. Plaintiff concedes that all originals of the 2008 Amended Trust bear Colonel Oliver's true original signature. (Def. Ex. 5, 6, 7, and 8).

- Colonel Oliver also executed a Last Will and Testament dated July 23, 2008, and that will was admitted to probate and has not been contested. The will disposes of certain "tangible and intangible personal properly" and then provides that the remainder of Colonel Oliver's estate is to be poured over into Colonel Oliver's Trust dated April 22, 1992, as amended, and to be distributed in accordance with the Trust and its amendments. (Pl. Ex. AQ).

### Colonel Oliver's Intent

- Although Colonel Oliver clearly loved his daughter and was proud of her

and her accomplishments, their relationship was characterized by tumult and emotional distance. Colonel Oliver repeatedly beseeched his daughter to visit him regularly at the Fairfax, stating in his emails that her inheritance from him was conditioned on her regular visits to him. Notwithstanding this clear indication that her inheritance depended on regular visits to him, plaintiff did not regularly visit her father, a fact that he highlighted in email correspondence with her and in other documents, as well. Specifically, plaintiff visited Colonel Oliver only five times between his move to the Fairfax in 2000 and his death in January 2012, including one visit during Colonel Oliver's final illness when plaintiff did not speak with Colonel Oliver at all.

- Colonel Oliver, in various communications, made unmistakably clear to plaintiff that her inheritance depended on regular visits to him at the Fairfax. For example, he emailed her on March 19, 2008, and the email stated in part (Def. Ex. 22):

You must come to visit me on a regular basis, and this weekend would be a superb opportunity. I cannot conceive of anything more important to you and for your financial future.

I have been at Fort Belvoir for over eight years. You have come here twice for reasons other than to visit me. I have waited hopefully for a decade. With no result.

With respect to your retirement years, you could receive quite a lot of inheritance from my Trust. But you must realize now and know that it will not be forthcoming to you unless you regularly visit me.

Except for Family memorabilia, you will not get benefits from my Trust unless you can prove to my Trustee you have made overnight visits to your Father at my residence every 3 months, that is at least four times a calendar year.

- Nor is there any doubt that plaintiff received and understood this email. She responded on March 26, 2008, saying in part (Def. Ex. 22):

Thank you very much for your clear andemphatic letter below. I am pleased to have your assurances that you wish to secure my financial future as that is of urgent concern to me. Given your history of pledges, however, I am not prepared to exchange my attentions in the present for future promises.

Now that you have designated our relationship a fee-for-service arrangement, you oblige me to require a deposit on your good faith. I am happy to attend your April party or celebrate your birthday as, by the way, I had been making plans to do. But first I need a check from you for $100,000.

- Colonel Oliver did not send plaintiff the $100,000. He later referred to this demand in a document he styled as "a description of my present personal relationships," dated July 26, 2008, three days after he executed the 2008 Amended Trust in issue here. In that document he stated (Def. Ex. 23):

I have only on living child, Jane Williams Oliver Ramesar of New York, NY. I have no longer any contact with her. She has never visited The Fairfax primarily to see me during my 8 years of residence. She has, to my knowledge, come to Washington only 2 times in that 8 year period to see art exhibits at the Smithsonian Museum. She looked once then at my

apartment but not long enough to sit down. She does not telephone, email, or write me. I have offered to pay her travel costs to visit me here. She emailed she would come if I sent her $100,000. That is $100,000. I do not know if she is married or divorced.

- Despite this exchange of emails in March of 2008, plaintiff did not visit her father until May 2009.

- In the same communication styled as "a description of my present personal relationships" dated July 26, 2008, Colonel Oliver expressed his affection for Mrs. Hines and Mrs. Lethgo, stating (Def. Ex. 23):

  Charleyrene D. Hines dwells in the Jefferson Bldg. of The Fairfax. She is my sole day-to-day person in contact. We check on each other by phone in the morning and evening. We have meals daily together. Cruise and travel together. She has taken me to the DeWitt Hospital Emergency Room; brings me food and necessary attention when I am sick. On one occasion in the middle of the night, I was quite ill with pneumonia and fell to the floor. I was unable to rise, pulled down an adjacent phone, and called her. She immediately came to my rescue accompanied by The Fairfax on-duty Security man.

  Charleyrene's Daughter is most caring for me.

- Colonel Oliver made pellucidly clear through his correspondence and otherwise that he was close to Mrs. Lethgo, that he relied on her for assistance in dealing with his estate, and that he intended to benefit her in the 2008 Amended Trust. For example, on July 24, 2008, the day after Colonel Oliver executed the 2008 Amended Trust, he emailed Mrs. Lethgo. (Def.

Ex. 31). In that email, he stated, among other things:

I have completed a major effort to update my Trust, Will, and Insurance Beneficiaries before our sailing.

I shall present to your Mother for deposit tomorrow in her Wachovia Safe Deposit Box Originals of my Trust and Will.... You will have access to that safe deposit box. Original Trust and Will copies are also now in my Folder at Navy Mutual Aid Assn, Henderson Hall, Arlington, VA.

You will have important responsibilities and benefits after the demise of me and then your Mother. Insurance policies: Veterans Administration, Mass Mutual, Navy Mutual, State of Maryland/Prince Georges County (Ms Sharon Wedge). Accounts at Charles Schwab, USAA Investment Corp., T. Rowe Price, Navy Federal Credit Union, Wachovia Bank.

Love WPO

- Colonel Oliver also gave Mrs. Hines and Mrs. Lethgo access to his apartment. On July 26, 2008, Colonel Oliver wrote a letter to Mrs. Lethgo authorizing and directing the Fairfax or any other authority to allow Mrs. Lethgo or Mrs. Hines access to Colonel Oliver's apartment at the Fairfax at any time, for any period of time, and for any purpose. The letter specified that Mrs. Lethgo and Mrs. Hines could enter the apartment singly or together on multiple occasions, if necessary, and that the directive remained in place regardless of Colonel Oliver's condition. The letter further states, "[a]n original copy of my Trust and of my Will, both executed on July 23, 2008, are located in my Apartment in the Navy Mutual Aid Assn. file in the filing cabinet in my bedroom under the television set. I authorize

either of you to take possession of these documents and remove them from my apartment." (Def. Ex. 24).

- Plaintiff did visit her father in May of 2009, and following that visit Colonel Oliver wrote to plaintiff after dropping her off at the train station. He described her visit as "the nicest 2 days since I moved to The Fairfax in 2000." He went on to say "[y]ou were perfectly lovely to me, you are absolutely gorgeous, and I so treasure your visit to me." But Colonel Oliver made his desire for another visit clear, concluding by saying "I look forward to another weekend with you, and I hope it will be soon." (Pl. Ex. BC).

- On June 5, 2009, Colonel Oliver wrote the following to plaintiff (Pl. Ex. BF);

  It is not easy to put in this message the depth of feeling I have for my Daughter.

  Family—the almost every day closeness of our life together starting in Hawaii and to Hampton Park—has been more important to me than anything else in life.

  In recent days I have been jubilant from the experience of your visit and frequent emails following. Hugely meaningful.

- Plaintiff contends that her father intended to amend his trust and to make her the primary residual beneficiary following her visit in May 2009. On June 27, 2009, Colonel Oliver wrote to plaintiff recounting Mrs. Hines's dental problems and saying that Mrs. Hines's family had "totally botched the situation." (Def. Ex. 32). He stated, in part:

  I had put in my WPO Trust provisions a whole lot of pesos for CDH's Daughter and Son-in-law. Based on my lat-

est personal interchange with them, 1 have decided:

  1. I have now a very strong positive view of you, my Daughter, based on your visit here and your constant emails since. I am very, very pleased to have that love from you. And its return from me to you.

  2. I intend to change promptly my trust and delete my substantial grants to Charley's children and Son-in-law.

  3. I shall provide for Charley during her lifetime and you most substantially

  I shall hope that with rail tickets provided by me I shall see you at The Fairfax monthly henceforth.

This memorandum clearly reflects that as of June 27, 2009, the 2008 Amended Trust did not have plaintiff as the primary residual beneficiary, as Colonel Oliver indicated that the trust provided a large sum of money for Mrs. Lethgo and that he intended to change the trust to benefit plaintiff. The record reflects that he never made that change, in large measure because plaintiff declined to come to the Fairfax monthly, as Colonel Oliver requested.

- Although Colonel Oliver suggested that he was going to change the 2008 Amended Trust to delete the substantial grants to Mr. and Mrs. Lethgo and to benefit plaintiff most substantially, he also made clear that such a change was contingent upon regular visits from plaintiff. There were no regular visits. Indeed, the record reflects that plaintiff visited her father only once between the time of this email and the beginning of her father's final illness in January 2012. Accordingly, there is no evidence that

Colonel Oliver ever changed the 2008 Amended Trust.[3]

- The fact that plaintiff did not regularly visit Colonel Oliver as he requested certainly did not escape his attention. He quickly resumed his requests for visits, asserting that plaintiff would not inherit money from him unless she visited. On July 10, 2009, Colonel Oliver wrote to plaintiff. (Def. Ex. 156). His email stated in part:

I doubt if you would find it tactful or diplomatic if one of your acquaintances remarked to you, 'Jane, you surely can't expect anything from your Father's estate. You've visited him once in ten years. He'll find some other person or purpose.'

With the above verbal wandering[4], I have come upon these thoughts following. I expect to change the provisions of my Trust this Summer.

I have been happy at our recent renaissance in email communications.

One of my Life's great loves has been the immense pleasure I received—as well as I gave—in journeying to Missouri at least monthly to visit my Father and Mother.

Not long back you wrote something like this, 'My Mother would expect you (WPO) to support your Children.' I have 2 reactions, maybe 3. First, there is no companion statement about 'My Children supporting their Father.' And second, I did provided for my Children for 22 years each plus graduate education housing; and it is surely time for support from Children to commence. Since Nancy is no longer with us, the burden is upon you.

I can provide rail tickets for your visits to me.

- Plaintiff testified she understood from Colonel Oliver's July 10, 2009 email that he wanted her to visit him monthly. Yet, she chose not to accede to his request for monthly visits. Indeed, plaintiff did not visit Colonel Oliver for two years following the July 10, 2009 email. Plaintiff next visited Colonel Oliver in August of 2011. Her visit lasted for two days, and she stayed with Colonel Oliver in his apartment. This was the last time she visited her father prior to his final illness. During this visit, plaintiff and Colonel Oliver discussed his passing, and Colonel Oliver provided her with a paper entitled "Steps to take When a Retired Marine Dies." He had made marks on the paper and asked her retain it. Plaintiff testified that Colonel Oliver showed her account statements for the funds in the trust, but plaintiff also testified that Colonel Oliver never showed her a copy of the trust itself. Colonel Oliver also invited plaintiff to open all of the cabinets and drawers and "reacquaint [herself]

---

3. Plaintiff provided conflicting testimony at trial and during her deposition about whether or not she believed Colonel Oliver intended to amend his trust in 2009 and whether she understood such an amendment to be contingent upon her making regular visits. At trial, an email was admitted in which plaintiff forwarded the June 27, 2009 email from her father to her friend Mr. Matusek and stated "Daughter and son-in-law [Mr. and Mrs. Lethgo] will be back in [the Trust] by Wednesday." (Def. Ex. 153). Importantly, plaintiffs understanding of Colonel Oliver's intent is not relevant; rather, the relevant fact is that there is no evidence that Colonel Oliver ever executed an amendment to the 2008 Amended Trust.

4. Colonel Oliver's use of the term "wandering" likely refers to the fact that this email ventures over a range of subjects before the excerpts quoted above.

with the family property, the rugs, the china, the silver, that he said would pass to [her] after he died." Plaintiff also testified that her father "insisted that [she] open the drawers of his secretary cabinet, which he told [her] would contain anything [she] needed in an emergency, such as ID cards, keys to the safe deposit box, keys to the storage areas to which [she] had access, etc."

- Colonel Oliver maintained until shortly before his death that he would give plaintiff a much larger inheritance in exchange for regular visits. On November 4, 2011, Colonel Oliver wrote to plaintiff. The email stated in part (Def. Ex. 33):

  Your best possible retirement income move would be regular visits to me—which would trigger an amendment to my living trust and highly increased payments to you after my demise.

- This email indicates that as of November 2011, less than three months prior to Colonel Oliver's death, his trust did not name plaintiff as the primary residual beneficiary. He also made clear in this communication that he was willing to increase the sum plaintiff would receive if she began visiting him regularly, but she did not do so. In fact, plaintiff did not see her father again until she received word that he was ill shortly before his death.

- Plaintiff testified that she interpreted the November 4 email as stating "that if I considered visiting more often, the benefits that my father had told me that August were in place would only be increased." On the basis of this record, the benefits that were in place in August did not include being the principal residual beneficiary. The benefits that were in place were the same benefits that were provided in the 2008 Amended Trust, namely that she would receive two and one-third percent of the assets in the trust upon Mrs. Hines's death.

- Colonel Oliver created other documents that reflected his affection for Mrs. Hines and Mrs. Lethgo, as well as his lack of visits from his daughter. In a typed document dated August 30, 2010 and titled "Access to my Apartment WW 205 at The Fairfax," (Def. Ex. 53) Colonel Oliver gave Mrs. Hines access to his apartment, denied plaintiff access to his apartment, and detailed his relationships with Mrs. Hines and plaintiff.

- First, Colonel Oliver gave Mrs. Hines unfettered access to his apartment, but significantly, barred his daughter from entering the apartment without Mrs. Hines's permission and accompaniment. He stated as follows:

  Charleyrene D. Hines is hereby authorized by me to have full access to my Apartment, WW205, and to all areas immediately described in following [sic] words and to have full access to all of my property therein. Mrs. Hines is the designated Successor to me as Trustee of my Trust, the legal instrument controlling my property.

  My Daughter Jane W. Oliver is hereby denied and prohibited by me from having any access to my Fairfax Apartment WW205 or to any other areas listed below. Provided, that Mrs. Hines may permit entry by Jane but only when Jane is accompanied by Mrs. Hines. Jane W. Oliver is to be prohibited from taking possession of any item owned or possessed by me unless permitted to do so in writing by Mrs. Hines.

- Second, Colonel Oliver expressed his affection for Mrs. Hines and described their close relationship, stating:

  Mrs. Charleyrene D. Hines resides in Apt. J406 of The Fairfax. Since 2003 we have had a close, mutually-supporting friendship. A daily relationship to check on each other by telephone, have all our meals together. We accompany each other to all our social events. This summer I took Mrs. Hines on 2 occasions to the DeWitt Hospital Emergency Room. And she took and attended me during my own DeWitt hospitalization in August, 2010.

- Finally, Colonel Oliver expressed his dissatisfaction with his relationship with plaintiff. He stated:

  My Daughter Jane has resided in New York City and now adjacent New Jersey for all the 10 years of my Fairfax residence. A through train from New York City to Woodbridge is easily available, and I have offered to pay her expenses. She has NEVER, NEVER come to the Washington area for the sole purpose of visiting me at The Fairfax.

  Some years ago she had business in Washington. I met her at the Alexandria, VA rail station, provided a meal in the Fairfax Dining Room. She was in my apartment for a 10 minute tour, not long enough to sit down.

  In 2009 she was in Charlottesville, Virginia for a memorial service for her late Mother's Brother. A relative dropped her off at WW205 late one afternoon. She departed at 6:30 AM the next morning. These are her only times at The Fairfax.

  She never telephones or writes me; her infrequent emails are usually unpleasant to me. I received neither present nor communication from her on my 90th Birthday last May.

- In sum, the evidence indicates that Colonel Oliver intended at the time he executed the 2008 Amended Trust to benefit Mrs. Hines during her lifetime and Mrs. Lethgo following Mrs. Hines's death. It is also clear that Colonel Oliver told plaintiff repeatedly over the years that his trust would not be amended to provide her with substantial sums unless she began regularly visiting him. Despite these clear messages, plaintiff only visited her father four times between 2000 and the end of 2011. As a result, Colonel Oliver never changed the 2008 Amended Trust to give his daughter a substantial portion of his assets. An email as recent as November 4, 2011, less than three months prior to Colonel Oliver's death, indicates that plaintiff was not the primary beneficiary of the 2008 Amended Trust and that Colonel Oliver would only modify the 2008 Amended Trust to make her the primary residual beneficiary based on regular visits from plaintiff. Colonel Oliver even barred plaintiff from his apartment as a result of her infrequent visits, and instead granted access to Mrs. Hines and Mrs. Lethgo, whom he relied on to handle his assets after his death. The 2008 Amended Trust accurately reflects Colonel Oliver's intent with respect to the disposition of his trust assets.

### Colonel Oliver's Illness and Death

- Colonel Oliver fell ill in January 2012. Plaintiff arrived in Virginia on January 16, 2012 and went immediately to the hospital to see her father. Plaintiff remained in Virginia only one day. She testified that her father was "comatose" during her entire visit, that she did not speak with him at all

during her visit, and that she left to return to New York on the morning of January 17, 2012. Colonel Oliver regained consciousness later in the day on January 17, but plaintiff testified that she did not speak with her father before he died because she was distressed by the papers she found in his apartment that barred her from accessing his apartment. Plaintiff testified that she thought it was kinder not to confront him about these papers.

- Although Colonel Oliver did not speak with plaintiff during his final illness, he did have numerous conversations with Mrs. Hines and Mrs. Lethgo throughout this period. On January 15, 2012, Colonel Oliver talked to Mrs. Lethgo on the phone, told her that he was not well, and asked her to come from New Mexico to Virginia immediately to assist him and Mrs. Hines, which she did. Mrs. Lethgo and her mother visited Colonel Oliver at least three times per day beginning on January 17 and continuing until his death on January 22. Colonel Oliver recognized them and was able to speak with them during those visits. During his hospital stay, Colonel Oliver repeatedly discussed his assets with Mrs. Lethgo, where those assets were located, and what he wanted Mrs. Lethgo to do with those assets. Mrs. Lethgo also visited Colonel Oliver on the evening that he died, January 22, 2012.

### Events Following Colonel Oliver's Death

- On January 23, 2012, the day after Colonel Oliver's death, Mrs. Hines and Mrs. Lethgo, as Colonel Oliver

had directed, went to Colonel Oliver's safe deposit box and removed from the safe deposit box a duplicate original of Colonel Oliver's 2008 Amended Trust (Def. Ex. 5) and a Last Will and Testament. Mrs. Hines was able to access Colonel Oliver's safe deposit box because, at Colonel Oliver's direction, she was made a co-signer on the box. Also on January 23, 2012, Mrs. Hines and Mrs. Lethgo retrieved another duplicate original of Colonel Oliver's 2008 Amended Trust from Mrs. Hines's safe deposit box. (Def. Ex. 6).[5] Mrs. Lethgo delivered the duplicate originals of the 2008 Amended Trust retrieved from Colonel Oliver's safe deposit box and Mrs. Hines's safe deposit box to attorney Craig Baumann on January 24, 2012 and did not see these documents again until the Sunday prior to trial. Colonel Oliver had provided Navy Mutual Aid with a signed original of the 2008 Amended Trust, and on receiving notification of his death, Navy Mutual mailed that original to Mrs. Hines in February 2012. That original is missing pages 5 and 6. (Def. Ex. 7). Mrs. Lethgo found an additional signed duplicate original in the Navy Mutual file in Colonel Oliver's filing cabinet in his bedroom (Def. Ex. 8), along with an unsigned version of his Last Will and Testament and an unsigned version of the 2008 Amended Trust. This duplicate original of the 2008 Amended Trust was found by Mrs. Hines and Mrs. Lethgo precisely where Colonel Oliver's July 26, 2008

---

**5.** Plaintiff's Exhibits 5, 6, and 8 are duplicate originals of the 2008 Amended Trust with identical provisions. References hereafter to the 2008 Amended Trust refer to Exhibits 5, 6, and 8, the three duplicate originals. Ex-

hibit 7 also appears to be an original of the 2008 Amended Trust but is missing pages 5 and 6 and is therefore not included in this reference.

instructions to Mrs. Hines and Mrs. Lethgo stated it would be found.

- In accordance with his instructions, Mrs. Lethgo and Mrs. Hines had access to Colonel Oliver's computer following his death. Mrs. Lethgo testified that in accordance with Colonel Oliver's instructions, she accessed his computer on January 23,2012 and retrieved a document Colonel Oliver had entitled "Checklist for Charleyrene" dated December 21, 2011. The document provides details on the steps that Mrs. Hines was to take with regard to Colonel Oliver's assets.

- Mrs. Lethgo testified credibly and persuasively concerning where she obtained the duplicate originals of the 2008 Amended Trust and the fact that she took two of the duplicate originals to attorney Craig Baumann on January 24, 2012, two days after Colonel Oliver's death. She also testified credibly and persuasively that Colonel Oliver had instructed her that upon his death she should access his computer, and she did so in accordance with his instructions. There is no credible or persuasive evidence or testimony to suggest that Mrs. Hines or Mrs. Lethgo altered any of the duplicate originals of the 2008 Amended Trust at any time.

- After Colonel Oliver died, the hospital had difficulty reaching plaintiff so that they could release Colonel Oliver's body. The hospital contacted Mrs. Hines, who emailed plaintiff asking that she contact the hospital to make the arrangements and stating that Mrs. Hines had selected the casket and paid the funeral home for transport and burial at Arlington Cemetery. Plaintiff responded, stating that plaintiff wanted copies of the documents granting Mrs. Hines the authority for any actions she was undertaking or contemplating. Communications between plaintiff's and Mrs. Hines's lawyers followed. (Doc. 164). Plaintiff made the arrangements for Colonel Oliver's funeral, and Mrs. Hines and the other residents of the Fairfax were not invited to attend. Mrs. Hines gave a cocktail party in Colonel Oliver's honor at the Fairfax because she and Colonel Oliver's friends had not been invited to the funeral.

## The Trust Documents

- The three duplicate originals of the 2008 Amended Trust contain identical provisions, although they exhibit differences in the printers and paper used to create them.

- Much of plaintiffs case is based on her personal observations of the duplicate originals of Colonel Oliver's 2008 Amended Trust, namely her personal observation that the documents "resemble nothing that [she] had ever seen" Colonel Oliver "officially produce." Yet, this testimony is not entitled to great weight because plaintiff admitted that she had not seen any wills or trusts created by Colonel Oliver, and moreover, had only visited him briefly four times in 11 years.

- Further, both parties agree that the signature pages of all the duplicate originals were signed by Colonel Oliver on July 23, 2008. Thus, there is no dispute that Colonel Oliver's genuine original signature appears on each of the duplicate originals. There is also no dispute that the signature page of each duplicate original was notarized on July 23, 2008 by Navy Mutual Aid employee and Notary Public Janice L. Poindexter. Ms. Poindexter testified that although she did not have a present recollection of

the occasion, her records confirmed that she had notarized the 2008 Amended Trust on July 23, 2008. Ms. Poindexter was shown Defendant's Exhibit 6, and although Ms. Poindexter first expressed surprise that she had notarized the 2008 Amended Trust, she stated that she did, in fact, notarize it. She also testified that she does not make the signatory sign or initial every page of a document.

- Plaintiff presented document expert Katherine Koppenhaver, who identified certain differences in form, but not in content, among the duplicate originals of the 2008 Amended Trust. Specifically, she identified the following:
  - Inconsistent margins and fonts are used within each of the duplicate originals.
  - Certain pages of the duplicate originals were printed on different types of printers.
  - Some pages within the duplicate originals had more staple marks than other pages.
  - Some pages of the duplicate originals were printed on a more yellowish paper than other pages.
  - Two of the pages were missing from the original of the 2008 Amended Trust received from Navy Mutual Aid.
  - A comparison of the letter "m" on each page of the duplicate originals reveals that particular pages within one duplicate original were not always printed on the same printer as the corresponding pages in the other duplicate originals.
- Although this testimony reflects that the pages in the duplicate originals were printed on at least three printers, there is no evidence that anyone other than Colonel Oliver printed and compiled these pages. Indeed, the record clearly reflects the contrary, namely that Colonel Oliver created and assembled all of the pages found in the duplicate originals of the 2008 Amended Trust. Significantly, the evidence indicates that Colonel Oliver created other important documents that reflect similar inattention to detail in form and that Colonel Oliver had access to all of the types of printers used in creating the 2008 Amended Trust originals. Computer forensic examination of Colonel Oliver's computer establishes that the drafts of the 2008 Amended Trust signed by Colonel Oliver and naming Mrs. Lethgo as the primary residual beneficiary were created on Colonel Oliver's computer shortly before he executed the 2008 Amended Trust on July 23, 2008 and that the drafts on Colonel Oliver's computer were not altered at any time after July 23, 2008, including after his death. Finally, and importantly, the 2008 Amended Trust is entirely consistent with the written record of his intention not to leave his daughter anything unless she regularly visited him, which she did not do.

- Despite plaintiff's assertion that the 2008 Amended Trust documents "resemble[d] nothing that [she] had ever seen" her father "officially produce," other documents were found in his apartment that belie the idea that Colonel Oliver's important documents always reflected attention to detail in form or presentation.
  - As previously mentioned, Colonel Oliver left a document entitled "Access to my Apartment WW205 at The Fairfax." This document is signed by Colonel Oliver on both the first and second pages. The first page of the document is print-

ed on the back of a prescription information sheet, and the top of the second page of the document says "Page—1". (Def. Ex. 53).

- Plaintiff also found another document in Colonel Oliver's apartment containing information on Colonel Oliver's various assets and how to access them upon his death. The document was intended to be read by Mrs. Hines and stated that she is not to take action unless and until Mrs. Lethgo is physically by her side and also reading the document. This document was also printed on the backs of prescription information sheets. The page numbers on this document are also inaccurate. The document says "Page—1" at the lop of the second page; "Page—2" just below the first paragraph of the third page; "Page—3" in the middle of the second paragraph on the fourth page; and "Page—4" in the middle of the fifth page. Colonel Oliver had also written various notes by hand on this document. (Def. Ex. 52).

- The evidence of the variations in the type of paper, printers, fonts, margins, and staple marks used in the duplicate originals of the 2008 Amended Trust does not point persuasively to the conclusion that the documents were prepared or altered by anyone other than Colonel Oliver. First, plaintiff admits that Colonel Oliver signed Page 8 of each of the 2008 Amended Trust duplicate originals. Plaintiff contends that Page 8 of Exhibit 5 was printed on a laser printer; Page 8 of Exhibit 6 was a photocopy of a page printed by an inkjet printer; Page 8 of Exhibit 7 was a photocopy of a page printed on a laser printer; and Page 8 of Exhibit 8 was printed on a laser printer. This confirms that Colonel Oliver had access to a laser printer, an inkjet printer, and a photocopier at the time he executed the 2008 Amended Trust and that he signed documents printed on each of these devices. Additionally, the fact that certain pages of the duplicate originals of the 2008 Amended Trust were printed on different printers suggests that this occurred by reason of Colonel Oliver's acts, rather than the acts of any person intent on creating and substituting pages without Colonel Oliver's knowledge or approval. This is so because had someone substituted pages, it might be expected that they would have taken care to ensure that the same printer and paper would be used for each of the substituted pages. Further, as noted, persuasive evidence was presented that, contrary to plaintiffs suggestion, Colonel Oliver did not always prepare or assemble important documents in an extremely meticulous fashion, and it is therefore far more likely that Colonel Oliver created the duplicate originals of the 2008 Amended Trust as they were admitted in this proceeding.

- Importantly, plaintiff offers no credible evidence that defendants altered the 2008 Amended Trust duplicate originals. Mrs. Lethgo credibly and persuasively testified concerning the manner in which she obtained the 2008 Amended Trust duplicate originals and what she did with them. Mrs. Lethgo also credibly and persuasively testified that she followed Colonel Oliver's instructions in carrying out his wishes after his death. All of this credible testimony, combined with the documentary evidence, rebuts plaintiff's virtually unsupported claim that the 2008 Amended Trust

duplicate originals were altered. Moreover, these documents accurately reflect Colonel Oliver's intent as expressed in his communications with plaintiff, Mrs. Hines, and Mrs. Lethgo.

### The Forensic Examination of Colonel Oliver's Computer

- Plaintiff also hired an expert to examine drafts of the 2008 Amended Trust found on Colonel Oliver's computer and floppy disks. The computer forensics expert, Mr. Maschke, found seven trust documents created prior to Colonel Oliver's death. All of these versions were created during the week prior to July 23, 2008, with the exception of one (Pl. Ex. U), which was created on July 24, 2008.
- Three drafts of the 2008 Amended Trust name plaintiff as the principal residual beneficiary of the trust following Mrs. Hines*s death. (Pl. Exhibits AA, AC, and AD). These versions were last modified on either July 16, 2008 or July 17, 2008. (Pl. Ex. AY).
- Four drafts of the 2008 Amended Trust name Mrs. Lethgo as the primary residual beneficiary following Mrs. Hines's death. (Pl. Ex. U, V, W, and AB). These files were last modified on the following dates:
  - Pl. Ex. AB—Last modified on July 18, 2008
  - Pl. Ex. V—Last modified on July 18, 2008
  - Pl. Ex. W—Last modified on July 19, 2008
  - Pl. Ex. U—Last modified on July 24, 2008. (Pl. Ex. AY).
- The computer forensic expert's findings in no way indicate that either Mrs. Hines, Mrs. Lethgo, or indeed anyone created new pages naming Mrs. Lethgo as the primary residual beneficiary when after his death, defendants had access to Colonel Oliver's computer pursuant to Colonel Oliver's instructions. Indeed, the forensic findings indicate the opposite. Just prior to executing the 2008 Amended Trust, Colonel Oliver created the versions of the trust that name Mrs. Lethgo as the primary residual beneficiary. And Colonel Oliver modified those versions just prior to executing the 2008 Amended Trust, while he ceased modifying the versions naming plaintiff as the primary beneficiary several days before, likely indicating that he intended the version naming Mrs. Lethgo to be the final version. None of the trust files on Colonel Oliver's computer were modified after he executed the 2008 Amended Trust, with the exception of one that was modified the day after. This further indicates that the trust was not altered by Mrs. Hines or Mrs. Lethgo after Colonel Oliver's death. Finally, the computer forensic evidence is consistent with and supportive of the documentary evidence indicating Colonel Oliver's intent to benefit Mrs. Lethgo as the primary residual beneficiary.

### Conclusions of Law

- Both parties agree that Virginia Code § 64.2–720(A) provides the relevant requirements for the creation of a trust. Those requirements are:
- (1) the settlor must have the capacity to form a trust;
- (2) the settlor must indicate his intention to create a trust;
- (3) the trust must have a definite beneficiary;

- (4) the trustee must have duties to perform; and
- (5) the same person must not be the sole trustee and the sole beneficiary.
- Four of these elements are undisputed. Neither party disputes that (i) Colonel Oliver had the capacity to form a trust, (ii) that the trust has definite beneficiaries, (iii) that the trustee has duties to perform, and (iv) that the same person was not the sole trustee and the sole beneficiary. The remaining element requiring that Colonel Oliver have the intention to create a trust is disputed. More specifically, the parties do not dispute that Colonel Oliver intended to form and execute a trust on July 23, 2008. In fact, the parties do not dispute that Colonel Oliver executed the signature pages attached to the original duplicates of the 2008 Amended Trust on that date. Rather, plaintiff argues that Colonel Oliver did not intend to execute *these particular* trusts.
- Plaintiff apparently advances two theories in support of her claim that the 2008 Amended Trust has been altered and does not reflect Colonel Oliver's intent with respect to his trust at the time he executed the 2008 Amended Trust. First, plaintiff all but accuses Mrs. Hines and Mrs. Lethgo of fraud by suggesting that they substituted pages of Colonel Oliver's executed trust for pages that made Mrs. Lethgo the primary residual beneficiary of the trust. Then, plaintiff vaguely argues that emails from the summer of 2009 indicate that another trust was executed after the

2008 Amended Trust and that that trust has since been destroyed or lost but should be given deference anyway, despite the fact that such a trust is nowhere to be found. There is no evidence that Colonel Oliver ever modified the 2008 Amended Trust, and in fact, emails from Colonel Oliver to plaintiff in November of 2011 indicate that at that time, the 2008 Amended Trust was still in effect and had not been changed by Colonel Oliver.

- The facts recited above indicate that Colonel Oliver did, in fact, intend to create and execute a trust on July 23, 2008, and that the trust he intended to create and execute is the 2008 Amended Trust presented by defendants in this case. It is clear that Colonel Oliver had a strong and very close relationship with Mrs. Hines and Mrs. Lethgo, that he relied on them for assistance with his daily tasks and for the administration of his estate, and that he intended to thank them and to express his affection by naming them as beneficiaries in his trust. It is also clear that although Colonel Oliver loved and admired his daughter, his relationship with her was tumultuous and lacking in warmth. Colonel Oliver repeatedly requested that his daughter come to visit him and made pellucidly clear that plaintiff would not inherit substantial sums of money from him unless she visited him regularly. Yet, she chose not to visit Colonel Oliver regularly; indeed, she visited him only four times in the eleven years before his death.[6]

---

**6.** Although the number of visits is arguably five, the fifth visit occurred after Colonel Oliver became ill. Plaintiff traveled to Virginia on January 16, 2012 and left early in the morning the next day without having spoken to her father, who she testified was "comatose." Although Colonel Oliver regained consciousness later on January 17, 2012 and was alert and conversant until his death on the January 22, 2012, plaintiff did not return to

- As evidence that the 2008 Amended Trust documents did not reflect Colonel Oliver's intent, plaintiff argues that the original duplicates were printed on different printers and different types of paper and that the documents do not display consistent margins or fonts or staple marks throughout. Although these observations are accurate, they do not point persuasively to a conclusion that the duplicate originals of the 2008 Amended Trust were altered either by Mrs. Hines, Mrs. Lethgo, or someone else. Rather, the evidence persuasively points to the conclusion that Colonel Oliver was responsible for these differences and that the 2008 Amended Trust clearly reflects his intent at the time that he executed the original duplicates and that he never changed the document from that time until his death.

- Plaintiff argues that the inconsistencies in the printers, paper, margins, fonts, and staple marks used within the 2008 Amended Trust duplicate originals show that they are altered documents. In this regard, plaintiff cites several cases holding that "if, on production of the [trust], it appears to have been altered, it is incumbent on *the party offering it* in evidence to explain this appearance." *Priest v. Whitacre,* 78 Va. 151, 155 (1883) (emphasis original) (quoting Greenleaf on Evidence, vol. I, section 564). These cases are unpersuasive as they are easily distinguished. It was clear in all of the cases cited that the documents were, in fact, altered following their creation. *See Hodnett's Adm'x v. Pace's Adm'r,* 84 Va. 873, 6 S.E. 217, 219 (1888) (at trial it was shown based on the face of the bond and expert testimony that the date on a bond had been changed from 1852 to 1853); *Bashaw's Adm'r v. Wallace's Adm'r,* 101 Va. 733, 45 S.E. 290 (1903) (due dates on a bond had been altered); *Tull v. Benton State Bank,* 257 Ark. 386, 387, 516 S.W.2d 583 (1974) (a will had been altered by the testatrix after execution without complying with the formal execution requirements for wills in Arkansas).

- But the only hint of evidence that the 2008 Amended Trust duplicate originals were altered after Colonel Oliver executed them is plaintiff's self-serving testimony that these documents are unlike anything else she had ever known her father to produce, even though on cross examination she admitted that she had never seen any wills or trust documents produced by her father and she had only seen her father four times in 11 years. No persuasive evidence shows that the duplicate originals were not in this condition at the time that Colonel Oliver executed them. Indeed, even if, under the burden-shifting scheme for altered documents, defendants were required to prove that the 2008 Amended Trust duplicate originals accurately reflected Colonel Oliver's intent, they have done so by demonstrating the facts laid out above. The record evidence, as a whole, points convincingly to the conclusion that the 2008 Amended Trust accurately reflects Colonel Oliver's intent at the time he signed the 2008 Amended Trust and at the time of his death, as he never changed the 2008 Amended Trust. The duplicate originals will not be treated as altered documents because there is no credible evidence

Virginia to visit him or speak with him on the telephone.

that they were altered after they were executed.

- Defendants are also correct that if plaintiff is arguing that Mrs. Hines and Mrs. Lethgo substituted the pages naming Mrs. Lethgo as the primary residual beneficiary, plaintiff would need to make such a showing by clear and convincing evidence because she would be accusing defendants of fraud. There is not even a scintilla of evidence to show that Mrs. Lethgo and Mrs. Hines altered Colonel Oliver's 2008 Amended Trust or that they acted improperly in any way, much less fraudulently. Therefore, any fraud claims must fail.
- Nor is there any doubt that Colonel Oliver created a valid trust on July 23, 2008 when he executed the duplicate originals of the 2008 Amended Trust. Plaintiff's contention that the 2008 Amended Trust does not accurately reflect Colonel Oliver's intent is wholly unpersuasive inasmuch as the record makes clear that the 2008 Amended Trust reflects Colonel Oliver's intent at the time that he executed the duplicate originals. There is also no evidence that he ever took any steps to alter the 2008 Amended Trust. Accordingly, the 2008 Amended Trust is not an altered document and will not be invalidated.

An appropriate Order will issue.

### ORDER

The matter was tried before the Court and is now ripe for decision.

For the reasons stated in the Findings of Fact and Conclusions of Law of even date.

It is hereby **ORDERED** that judgment on the instant declaratory judgment matter is **ENTERED** in favor of defendants and against plaintiff.

It is further **ORDERED** that the Clerk is **DIRECTED** to enter judgment in favor of defendants pursuant to Rule 58, Fed. R.Civ.P., in accordance with this Order, and to place this matter among the ended causes.

The Clerk is directed to send a copy of this Order to all counsel of record.